UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EXCELLED SHEEPSKIN & LEATHER
COAT CORP.,

                    Plaintiff,

v.

OREGON BREWING COMPANY,

                    Defendant.

Civil Action No. 12-cv-1416

**OREGON BREWING COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS
[PUBLIC VERSION]**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

LEGAL STANDARD.......................................................................................................2

LEGAL ARGUMENT.......................................................................................................3

I.    EXCELLED CANNOT PROVE OWNERSHIP OF THE ROGUE MARK
BECAUSE OBC IS THE PRIOR USER.................................................................3

    A.    OBC Acquired Trademark Rights For ROGUE For Clothing
Before Excelled Registered Its Trademark In December 2003 ..............4

    B.    OBC's Use Of The Mark ROGUE On Clothing Has Been
Continuous Since 1989 .........................................................................12

    C.    OBC's Use Of The Mark ROGUE Has Been On The Goods At
Issue In This Case Since 1989 ...............................................................13

II.    ALTERNATIVELY, SUMMARY JUDGMENT SHOULD BE
ENTERED AGAINST EXCELLED ON COUNTS I AND II BECAUSE
OF OBC'S UNCLEAN HANDS DEFENSE .......................................................13

    A.    Fraud on the PTO Supports a Defense of Unclean Hands....................13

    B.    Excelled's Registrations for its ROGUE-Formative Marks Were
Obtained By Fraud.................................................................................15

        1.    Excelled's ROGUE Registration .............................................15

        2.    Excelled's ROGUE LEATHER BY REILLY OLMES
Registration.............................................................................18

        3.    Excelled's REILLY OLMES ROGUE LEATHER
Registration.............................................................................19

        4.    OBC's Fraud Argument is Bolstered by the Expert
Testimony of Kenneth B. Germain..........................................20

III.    SUMMARY JUDGMENT MUST INDEPENDENTLY BE ENTERED
ON COUNT IV FOR FAILURE TO PROVE HARM TO CONSUMERS....................21

CONCLUSION................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baron Philippe de Rothschild v. Paramount Distillers, Inc.*,
    923 F. Supp. 433 (S.D.N.Y. 1996)........................................................................3

*Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*,
    457 F. Supp. 1090 (S.D.N.Y. 1978)......................................................................3

*Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*,
    616 F. Supp.2d 622 (N.D. Tex. 2009) .................................................................11

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
    841 F. Supp. 1339 (E.D.N.Y. 1994) ..............................................................13, 17

*Duffy-Mott Co., Inc. v. Cumberland Packaging Co.*,
    424 F.2d 1095 (CCPA 1970) ...............................................................................13

*Eliya, Inc. v. Kohl's Dep't Stores*,
    82 U.S.P.Q.2d 1088, 2006 U.S. Dist. LEXIS 66637 (S.D.N.Y. Sept. 13, 2006) ...................21

*Eyal R.D. Corp. v. Jewelex N.Y. Ltd.*,
    784 F. Supp. 2d 441 (S.D.N.Y. 2011)..................................................................21

*Fieldcrest Mills, Inc. v. Couri*,
    220 F. Supp. 929 (S.D.N.Y. 1963).........................................................................4

*Gen. Car & Truck Leasing Sys., Inc. v. General Rent-A-Car, Inc.*,
    17 U.S.P.Q.2d 1398 1990 U.S. Dist. LEXIS 12749 (S.D. Fla. July 11, 1990)............15, 18, 20

*Geo. Washington Mint, Inc. v. Washington Mint, Inc.*,
    349 F. Supp. 255 (S.D.N.Y. 1972).................................................................5, 11

*Hanover Star Milling Co. v. Metcalf*,
    240 U.S. 403 (1916)....................................................................................2, 4

*Havana Club Holding, S.A. v. Galleon, S.A.*,
    49 U.S.P.Q.2D (BNA) 1296, 1998 U.S. Dist. LEXIS 4065 (S.D.N.Y. Mar. 31, 1998).........14

*Housing & Servs., Inc. v. Minton*,
    No. 97 Civ. 2725, 1997 U.S. Dist. LEXIS 8883 (S.D.N.Y. June 24, 1997)............................5

*ITC Ltd. v. Punchgini*,
    482 F.3d 135 (2d Cir. 2007)...........................................................................2, 3

*Knights of Armament Co. v. Optical Sys. Tech., Inc.*,
    636 F. Supp.2d 1283 (M. D. Fla. 2009)...........................................................2, 11

-ii-

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
    15 F. Supp. 2d 389 (S.D.N.Y 1998)....................................................................................5

*Lifeguard Licensing Corp. v. Gogo Sports, Inc.*,
    10-cv-9075, 2013 U.S. Dist. LEXIS 115668 (S.D.N.Y. Aug. 15, 2013)................................22

*Luv N' Care, Ltd. v. Walgreen, Co.*,
    695 F. Supp. 2d 125 (S.D.N.Y. 2010)....................................................................................21

*MyPlayCity, Inc. v. Conduit Ltd.*,
    No. 10-cv-1615, 2012 U.S. Dist. LEXIS 47313 (S.D.N.Y. Mar. 30, 2012)...........................22

*Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc.*,
    842 F.2d 650 (2d Cir. 1983)............................................................................................16, 18

*Patsy's Italian Restaurant, Inc. v. Banas*,
    658 F.3d 254 (2d Cir. 2011)..................................................................................................14

*Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*,
    887 F. Supp. 2d 519 (S.D.N.Y. 2012)...................................................................................11

*Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*,
    No 08 Civ. 0068, 2010 U.S. Dist. LEXIS 52795 (E.D.N.Y. Mar. 11, 2010) .........................21

*Polo Fashions v. Extra Special Prods, Inc.*,
    208 U.S.P.Q. (BNA) 421, 1980 U.S. Dist. LEXIS 16290 (S.D.N.Y. Mar 5, 1980)...............15

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945)..............................................................................................................13

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F. 3d 1190 (9th Cir. 2012) ...............................................................................................5

*Ritz Cycle Car Co. v. Driggs-Seabury Ordnance Corp.*,
    237 F. 125 (S.D.N.Y. 1916)....................................................................................................5

*Sengoku Works, Ltd. v. RMC International, Ltd.,*
    96 F.3d 1217 (9th Cir. 1996) ..................................................................................................2

*Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*,
    486 F.2d 114 (5th Cir. 1973) ..................................................................................................4

*T Shirts Plus v. T-Shirts Plus, Inc.*,
    222 U.S.P.Q. 117, 1983 U.S. Dist. LEXIS 13717 (C.D. Cal. Sept. 15, 1983) ...................3, 11

*Torres v. Cantine Torresella*,
    808 F.2d 46 (Fed. Cir. 1996)............................................................................................14, 18

*Tuccillo v. Geisha NYC, LLC,*
   635 F. Supp. 2d 227 (E.D.N.Y. 2009) ...................................................................14

*United Drug Co. v. Theodore Rectanus Co.,*
   248 U.S. 90 (1918).......................................................................................................2

*Waldes v. Int'l Mfrs.' Agency, Inc.*, 237 F. 502 (S.D.N.Y. 1916)....................................5

*Watec v. Liu,*
   403 F.3d 645 (9th Cir. 2005) ......................................................................................3

*Windows User, Inc. v. Reed Business Pub., Ltd.*,
   795 F. Supp. 103 (S.D.N.Y. 1992).......................................................................5, 11

STATUTES

15 U.S.C. § 1127.................................................................................................................4

Unfair Trade Practices under Gen. Bus. Law § 349 ..................................................1, 21

OTHER AUTHORITIES

3 Anne Gilson LaLonde, *Trademark Practice & Protection* §11.08[3][a][iii] .............................15

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* (4TH ED. 2009) ...2, 3, 4, 6

*Meckatzer Lowenbrau Benedikt Weiss KG v. White Gold, LLC*,
   95 U.S.P.Q.2D (BNA) 1185 TTAB LEXIS 132 (TTAB 2010) ..................................15, 17, 19

*Mister Leonard, Inc. v. Jacques Leonard Couture, Inc.*, 1992 TTAB LEXIS 8, 23
   U.S.P.Q.2d 1064 (TTAB Apr. 22, 1992)........................................................................ passim

*Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*,
   186 Fed. Appx. 1005, 77 USPQ2d 1917 (TTAB 2006) ..........................................................17

*Zanella Ltd. v. Nordstrom, Inc.*,
   90 U.S.P.Q.2D (BNA) 1758 TTAB LEXIS 365 (TTAB 2009) .............................................19

**DEFENDANT OREGON BREWING COMPANY'S
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

Defendant Oregon Brewing Company ("OBC") respectfully seeks entry of summary judgment on all counts of Plaintiff Excelled Sheepskin & Leather Coat Corp.'s ("Excelled's") Complaint (Dkt. No. 1). Each of Excelled's alleged claims is doomed because Excelled does not own the rights to the trademark ROGUE. In fact, OBC, as the first user of the mark ROGUE in commerce throughout the United States, owns the mark. Because Excelled cannot prove the first required element of each of its claims, i.e. priority of use, summary judgment is appropriate on each claim found in Counts I – V of Excelled's Complaint.

In the alternative, OBC is independently entitled to summary judgment on Counts I and II of Excelled's Complaint (counterfeiting and infringement of a registered mark) because Excelled's trademark registrations were obtained by fraud on the U.S. Patent and Trademark Office ("PTO"), and thus Excelled has unclean hands. Further, summary judgment must be entered on Count IV on Excelled's Complaint (Unfair Trade Practices under Gen. Bus. Law § 349) because Excelled has failed to state a cognizable claim under this statute.

**INTRODUCTION**

To prove trademark infringement, Excelled must prove trademark ownership. Trademark ownership belongs to the first party to make a bona fide use of the contested mark in commerce on the goods at issue in the case. OBC began using the ROGUE mark on clothing in 1989, and immediately expanded the advertising, distribution and sale of that clothing nationwide. By contrast, Excelled commenced the sale of clothing under the ROGUE mark over a decade later in 2000 and did not secure a federal trademark registration for a ROGUE-formative mark until December 2003. Because there is no genuine issue of material fact that OBC adopted the

ROGUE mark for clothing over a decade before Excelled; advertised, distributed and sold ROGUE-branded clothing to millions of consumers throughout the United States over a decade before Excelled; and continuously used the ROGUE mark on clothing over a decade before Excelled, Excelled cannot establish trademark priority and thus, trademark ownership. Thus, OBC is entitled to summary judgment on all of the claims alleged in Excelled's Complaint as a matter of law.

## LEGAL STANDARD

For nearly a century, the law has been well-established that trademark ownership belongs to the party who first uses the mark on the goods at issue in the case. *E.g., Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415 (1916). As the Supreme Court held: "Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918). This principle of trademark ownership has been applied by this Court and Circuit courts throughout the country. *ITC Ltd. v. Punchgini*, 482 F.3d 135, 155 (2d Cir. 2007) ("United States trademark rights are acquired by, and dependent upon, priority of use."); *Sengoku Works, Ltd. v. RMC International, Ltd.,* 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use."). *See generally* 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 16:1 (4TH ED. 2009) ("The basic rule of trademark ownership in the United States is priority of use. For inherently distinctive marks, ownership goes to the first entity to use the designation as a mark."). If plaintiff cannot prove ownership by priority of use, courts dismiss plaintiff's trademark claims with prejudice on summary judgment. *E.g., Knights of Armament Co. v. Optical Sys. Tech., Inc.*, 636 F. Supp.2d 1283, 1296-1302 (M. D. Fla. 2009) (awarding summary judgment to defendant –

plaintiff's trademark claim failed as a matter of law because defendant used the disputed mark before plaintiff)*; T Shirts Plus v. T-Shirts Plus, Inc.*, 222 U.S.P.Q. 117, 1983 U.S. Dist. LEXIS 13717, *6-8 (C.D. Cal. Sept. 15, 1983) (same).

## LEGAL ARGUMENT

## I.    EXCELLED CANNOT PROVE OWNERSHIP OF THE ROGUE MARK BECAUSE OBC IS THE PRIOR USER

Excelled claims infringement of its federally registered and common law rights in the mark ROGUE and formatives thereof, including its oldest registration for a ROGUE-formative mark, which issued on December 9, 2003.  (*See* Dkt. No. 1; SOF[1] ¶ 3.)  To win on these claims, Excelled must prove trademark ownership through priority of use in commerce.  *ITC Ltd.*, 482 F.3d at 155.

OBC can defeat Excelled's claims if it shows: "1) acquisition of trademark rights under state law prior to the date of the incontestable registration; 2) continuance of use of the trademark from that date; and 3) the prior use is on goods which are in issue in the case if infringement is proven."  5 McCarthy § 26:53; *accord Watec v. Liu*, 403 F.3d 645, 652-53 (9th Cir. 2005).  As Professor McCarthy explains: "If the senior common law user already has established trademark rights throughout the United States, then the owner of [a federal] trademark registration has no rights and the registration is ineffectual."  5 McCarthy § 26:53.  *See generally Baron Philippe de Rothschild v. Paramount Distillers, Inc.*, 923 F. Supp. 433, 438 (S.D.N.Y. 1996) ("Even assuming that the [] defendants' mark is incontestable...it would not be incontestable against a senior user."); *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1100 (S.D.N.Y. 1978) (defendant's incontestable registration is not "incontestable" against the senior

---

[1] Citations to the "SOF" refers to OBC's Statement of Undisputed Material Facts, as separately filed this same date.

user – judgment entered in favor of senior user).[2]  As shown below, there is no genuine issue of material fact regarding these three elements..

### A. OBC Acquired Trademark Rights For ROGUE For Clothing Before Excelled Registered Its Trademark In December 2003

Excelled's oldest registration for a ROGUE-formative mark issued on December 9, 2003. (SOF ¶ 69.)   Thus, OBC has acquired rights, and is the "owner" and "senior user," if it demonstrates that it used the ROGUE mark for clothing before December 9, 2003.  *See* 2 McCarthy § 16:4 ("For [inherently distinctive] marks, the first to use a designation as a mark in the sale of goods or services is the `owner' and the `senior user.'  These marks are given legal protection against infringement immediately upon adoption and use in trade.") (collecting federal and state law cases).  There is no genuine issue of material fact that OBC commenced use of the mark ROGUE for clothing, and expanded that use nationwide, over 13 years before Excelled's federal trademark registration issued in December 2003. (SOF ¶¶ 11-54.)

The Lanham Act defines trademark use, which in turn gives rise to trademark rights, as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark." 15 U.S.C. § 1127.  As this Court held: "The test used to determine the prior continuous user is not the volume of sales or advertising or the degree of familiarity of the public with the mark."  *Fieldcrest Mills, Inc. v. Couri*, 220 F. Supp. 929, 931 (S.D.N.Y. 1963); *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123 (5th Cir. 1973) ("The mere fact that a

---

[2] In evaluating priority, the inquiry is whether the defendant proves priority in a particular geographic territory – not in a specific channel of trade within a geographic territory.  *See, e.g.*, *Hanover Star Milling*, 240 U.S. at 415 ("In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question."); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 122-123 (5th Cir. 1973) (senior user had established rights to the mark in all channels of trade in certain geographic areas where it had continuously sold products bearing the mark — even though its sales were modest and primarily door-to-door, and even though its sales were mostly wholesale whereas defendant's sales were mostly retail).  *See generally* 5 McCarthy Section 26:2 ("The common law rules regarding remote geographical use were laid down by the Supreme Court in two landmark cases in 1916 and 1918 – [*United Drug Co.* and *Hanover Star Milling*.]")

business is small and its trade modest does not necessarily militate against its being an established business capable of acquiring goodwill and rights in a trademark.").

A single, bona fide use of the mark is sufficient to establish trademark priority. *See, e.g., Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 397 (S.D.N.Y 1998) ("The use of a protectable mark need not have gained wide public recognition, for adoption and a single use of the mark may be sufficient to entitle the user to register the mark."); *Ritz Cycle Car Co. v. Driggs-Seabury Ordnance Corp.*, 237 F. 125, 128 (S.D.N.Y. 1916) (two sales and use of mark in advertisements showed prior use); *Waldes v. Int'l Mfrs.' Agency, Inc.*, 237 F. 502, 504-05 (S.D.N.Y. 1916) (Hand, J.) (continuous use of mark on products, even if the number of products sold is small, establishes prior use). *See generally* 2 McCarthy § 16:6 ("[E]ven the most robust and strong mark may have been launched in the marketplace with a small number of sales or a modest level of pre-sales promotional advertising.").

In fact, in determining priority, a court may rely on activities relating to the mark other than sales of the products at issue, including promotional activities under the brand and other activities that publicize the mark. *See, e.g., Housing & Servs., Inc. v. Minton*, No. 97 Civ. 2725, 1997 U.S. Dist. LEXIS 8883 at *10-12 (S.D.N.Y. June 24, 1997) (applying "totality of circumstances" test to determine trademark priority – "[A]nalogous use of a mark has consistently been held sufficient to establish priority rights as against subsequent users of the same or similar marks."*); Windows User, Inc. v. Reed Business Pub., Ltd.*, 795 F. Supp. 103, 108 (S.D.N.Y. 1992) ("[A]dvertisements and promotional activities may be relied upon to demonstrate priority in use of a mark. . . ."); *Geo. Washington Mint, Inc. v. Washington Mint, Inc.*, 349 F. Supp. 255 (S.D.N.Y. 1972) (creating sample products and taking orders was sufficient to establish prior use – "Actual sale is not necessary."). *See generally Rearden LLC v.*

*Rearden Commerce, Inc.*, 683 F. 3d 1190, 1205-08 (9th Cir. 2012) (applying "totality of circumstances" test to determine whether non-sale activities under the mark sufficed to establish priority – non-sales activities such as media coverage, advertising, and sale of other merchandise bearing the mark relevant in determining priority).[3]

Applying the law here, there is no genuine issue of material fact that OBC acquired rights in the ROGUE mark for clothing throughout the United States prior to Excelled's registration date of December 9, 2003.[4]   Continuously since at least 1989, OBC has sold alcohol beverages, clothing, and other merchandise bearing the trademark ROGUE in commerce and throughout the United States.   (SOF ¶ 11.)   Because OBC has always viewed itself as being in the lifestyle business, not the beer business (SOF ¶ 10), OBC's merchandising efforts from the outset included the sale of ROGUE-branded clothing – a practice that is commonplace in the craft beer industry. (SOF ¶ 12.)   ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████ ROGUE

Mission, part of which was to "remember it is not simply a matter of profit but a highly personal work of art."   (SOF ¶ 34.)   For this reason, OBC has marketed its ROGUE-branded clothing to,

---

[3] Excelled may argue—as it has in each prior submission before this Court—that OBC's rights in the mark ROGUE are limited to non-retail trade channels, namely OBC's brewpubs and OBC's website.  This argument is simply wrong.  As explained above, trademark rights are determined by priority of use in a geographic region—not in a trade channel.  OBC has been able to locate only a single case—*Elizabeth Taylor Cosmetics Co. v. Annick Goutal S.A.R.L.*, 673 F. Supp. 1238 (S.D.N.Y. 1987)—where a court issued an injunction based on channels of trade. Professor McCarthy describes Elizabeth Taylor as "unusual" and "the first time that a court has tailored injunctive relief according to the style or type of retail outlet handling the product for sale to the public."  *See* 4 McCarthy § 24:51.  Elizabeth Taylor is distinguishable from the facts here because the Court there entered an injunction against **the junior user** barring it from selling its products under the disputed mark in "first-tier" department stores.  *Id.* at 1249.  The Court specifically noted that in issuing an injunction in certain trade channels, it was deviating from established trademark law.  *Id.* at 1249.  Significantly, the Court in *Elizabeth Taylor* did not enjoin the senior user of the mark in that case in any way.  Here, by contract, Excelled seeks to enjoin OBC, the senior user of the ROGUE mark.

[4] To the extent Excelled argues that priority of use must be established prior to January 10, 2000 – Excelled's admitted first sale under any of the ROGUE marks – the evidence is undisputed that OBC has established that as well.  (SOF ¶¶ 11-54.)

among other consumers, potential and actual purchasers of its ROGUE-branded beer. (SOF ¶ 35.)

Initial ROGUE clothing sales and promotional distribution occurred at OBC's brewpubs in Oregon (1988), Washington (2000), and then California (2003). (SOF ¶¶ 13-16.) OBC's Rogue Meeting Halls (or restaurants) began selling ROGUE clothing as early as 1989 in Newport, Oregon, and ultimately was expanded to all eleven establishments stetching from San Francisco to Issaquah, Washington. (SOF ¶ 13.) By 2000, tens of thousands of customers from throughout the United States had visited OBC's brewpubs and Rogue Meeting Halls and encountered OBC's ROGUE mark for sale on clothing. Many thousands of customers purchased or were given ROGUE clothing before 2000 and before December 2003. (SOF ¶¶ 17, 38.)

Beginning in 1989, OBC engaged a distribution network to expand the ROGUE brand, which began the steady expansion of ROGUE-branded product sales throughout the United States. ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

Without exception, where a distributor sold ROGUE beer or spirits, it also sold or gave away ROGUE-branded clothing. (SOF ¶ 20.) By the year 2000, dozens of distributors were distributing ROGUE-branded clothing to consumers throughout the United States, and yet more distributors were added by December 2003. (SOF ¶ 21.) At some point prior to 2000, OBC began including on certain of its Rogue Ales six-pack packaging distributed throughout the United States, an order form for ROGUE-branded clothing. Hundreds of thousands of ROGUE beer six packs were sold by retailers prior to December 2003 and 2000 containing these

solicitations for ROGUE clothing orders.  (SOF ¶ 35.)  OBC also directly targeted its distributors

for clothing and other ROGUE-branded merchandise sales – a practice that began in 1989 with

the mailing of OBC ROGUE catalogs and brochures offering ROGUE clothing for sale.  (SOF

¶ 37.) ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

OBC's nationwide expansion of the ROGUE brand prior to 2000 was further helped by

OBC's employment of various "brokers," who worked as independent contractors in different

regions of the United States selling and giving away ROGUE-branded beer, clothing, and other

merchandise.  (SOF ¶ 22.)  OBC's network of brokers had as their job the advertisement and

promotion of ROGUE, including ROGUE beer and ROGUE clothing, throughout the United

States, and distributed many thousands of units of ROGUE-branded clothing to consumers

throughout the United States prior to December 2003 and 2000.  (SOF ¶ 23.)

Since 1989, OBC also has participated in various beer festivals throughout the nation as

part of the development and growth of its ROGUE brand.  (SOF ¶¶ 32-33.)  Wherever OBC's

ROGUE beer has appeared, OBC has also offered ROGUE clothing for sale, including at the

following festivals, where OBC has sold its ROGUE-branded beer and merchandise since at least

the mid-1990s: Great American Beer Festival (Denver, CO), the SunSounds Festival (Arizona),

Empire State Brewing & Music Festival (Syracuse, NY), the Brewgrass Festival (Asheville,

NC), and the Kona Brewers Festival (Kona, HI).  In addition, OBC participated yearly in the

Great American Beer Festival ("GABF"), bringing together each year tens of thousands of

established and prospective customers of the ROGUE brand, from all across the nation. (SOF ¶ 33.) Estimates for early attendance at GABF range from 28,000 in 1999 to 50,000 in more recent years. (*Id.*) OBC has sold merchandise, including ROGUE-branded t-shirts, every year at the GABF since 1989, and as a result, by 2000, OBC's ROGUE beer and ROGUE-branded clothing had been seen by hundreds of thousands of consumers at the GABF alone. (*Id.*)

Additional expansion of the ROGUE brand was made possible through OBC's thriving mail order business for clothing, which began as early as 1994. (SOF ¶ 24.) ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████

Finally, OBC developed direct third-party retail relationships for the sale of its ROGUE-branded clothing. As early as 1995, ROGUE-branded clothing was offered for sale in Fred Meyer and Cost Plus – two retail superstores. (SOF ¶ 26.) Multiple other third-party retailers sold OBC's ROGUE-branded clothing prior to 2000, including Ashton Food Market, Brewery Collectibles, C&K Market, John's Grocery, Made in Oregon, and Oregon's Best. (SOF ¶ 27.) Thus, prior to December 2003 and by 2000, OBC's ROGUE-branded clothing, as displayed, marketed, and sold by the various retailers, had been seen by multiple thousands of people throughout the United States on an annual basis. (SOF ¶ 28.)

OBC's marketing efforts for its clothing grew and developed as the ROGUE brand expanded. By December 2003 and 2000, OBC had engaged in the marketing and advertising of

---

█████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████

its ROGUE-branded clothing through the Internet, over email, through its "100% Pure Rogue" newsletter and on-line newsletters, and through the creation of the Rogue Nation fan club. (SOF ¶¶ 39-41, 43-44, 46. OBC's first website, www.rogueales.com, went online and was made available to the consuming public in 1995, and began offering OBC's ROGUE-branded clothing for sale at least as early as 1997. (SOF ¶ 43.) When OBC's current website, www.rogue.com, was made available to the public in March or April 1999, ROGUE-branded clothing was immediately available for sale on that website. (*Id.*) Thus, by January 2000 and by December 2003, hundreds of thousands of people had visited OBC's Rogue web sites and were exposed to OBC's ROGUE clothing, among other web content. (SOF ¶ 44.) More recently (in 2008-2009), OBC began marketing its ROGUE brand, including its clothing, on Twitter and Facebook.

Since 1994, OBC has published a newsletter, entitled "100% Pure Rogue," which it has distributed to distributors and consumers throughout the United States, made available at festivals, and made available at OBC's brewpubs. (SOF ¶ 40.) In many of these newsletters, OBC would offer for sale its ROGUE-branded clothing. (*Id*.) By December 2003 and 2000, OBC had continuously mailed and distributed its "100% Pure Rogue" newsletter, and its advertisements for ROGUE-branded clothing, to many thousands of people throughout the United States, and today these newsletters are distributed to more than ███████ Rogue Nation members and retailers. (SOF ¶ 41.) In addition, beginning in 1989 and continuing to present day, OBC also has continuously given away innumerable pieces of its ROGUE-branded clothing as promotional items to distributors, to businesses, and to consumers at festivals and events throughout the United States. (SOF ¶ 38.)

Because of its marketing efforts and unique branding over the years, OBC and its ROGUE brand have generated a loyal following of consumers throughout the United States.

(SOF ¶ 39.)  In approximately 1994, OBC formed the "International Association of Rogues," an organization for fans of OBC's ROGUE brand, and a precursors of OBC's Rogue Nation, formed in 2001.  (SOF ¶ 39.)  As part of their sign-up package, members of the "International Association of Rogues" would receive a ROGUE-branded t-shirt.  (SOF ¶ 39.)  Today, there are over ███████ members of the Rogue Nation in all fifty states and the District of Columbia.  (*Id.*)  Thus, the impact of OBC's ROGUE-branded clothing business on the strength of OBC's ROGUE brand cannot be measured by sales revenues alone.  *See, e.g.*, *Windows User,* 795 F. Supp. at 108 ("[A]dvertisements and promotional activities may be relied upon to demonstrate priority in use of a mark. . . ."); *Geo. Washington Mint,* 349 F. Supp. 255 (creating sample products and taking orders was sufficient to establish prior use – "Actual sale is not necessary."). Because Excelled's registration issued on December 9, 2003, the facts are undisputed that OBC acquired trademark rights in ROGUE for clothing nationwide long before Excelled.[6]  *See, e.g., Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 530 (S.D.N.Y. 2012) (summary judgment dismissing trademark infringement counterclaim – "overwhelming evidence" that plaintiff had priority of use); *Knights of Armament Co. v. Optical Sys. Tech., Inc.*, 636 F. Supp.2d 1283, 1296-1302 (M. D. Fla. 2009) (awarding summary judgment to defendant – plaintiff's trademark claim failed as a matter of law because defendant  used the disputed mark before plaintiff)*; T Shirts Plus v. T-Shirts Plus, Inc.*, 222 U.S.P.Q. 117, 1983 U.S. Dist. LEXIS 13717, *6-8 (C.D. Cal. Sept. 15, 1983) (awarding summary judgment to defendant – plaintiff's trademark claim failed as a matter of law because defendant  used the disputed mark for t-shirts before plaintiff).  *See also Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*,

---

[6] Indeed, OBC's use of the mark predates Excelled's admitted first use of the mark by a decade.  (SOF ¶ 60.)

616 F. Supp.2d 622, 633-34 (N.D. Tex. 2009) (granting summary judgment and cancelling defendant's trademark registration because plaintiff proved it used the mark prior to defendant).

**B.**    **OBC's Use Of The Mark ROGUE On Clothing Has Been Continuous Since 1989**

OBC's use of the ROGUE mark on clothing has been continuous since 1989.  As shown *supra*, Section IA, OBC expanded its sales through the 1990s such that by January, 2000 its use and advertising of the ROGUE mark for clothing was nationwide.  In addition to continuing and expanding the sales and promotional efforts described *supra*, Section I-A, in the last decade OBC has expanded its presence both online and through various stores.  Specifically, OBC's ROGUE-branded clothing has been sold in Beer Clothing Co., Crazy Shirts, Portland State University's bookstore, sharpedgebeer.com, and Whole Foods.  (SOF ¶ 29.)  In 2012, OBC established online stores at eBay.com and Amazon.com.  (SOF ¶ 31.)  And, through a 2011 license with Palmer Cash, OBC's ROGUE-branded clothing has appeared in retail stores such as Urban Outfitters, Nordstrom, and Sears.  (SOF ¶ 30.)  These additional retail store sales complement the continuing sales of ROGUE clothing through distributors, brokers, mail order, and festivals.  Indeed OBC's marketing of its ROGUE brand has paid off:  domestic sales of beer rose from approximately ███████ in 1999 to approximately ████████ in 2012.  (SOF ¶¶ 50, 55.)  Sales of OBC's ROGUE-branded clothing, which supports OBC's sales of beer, rose from approximately ██████ in the second half of 1999 to ██████ in 2012.  (SOF ¶¶ 51, 56.)  Thus, OBC has established continuous use of the ROGUE mark for clothing nationwide.

### C. OBC's Use Of The Mark ROGUE Has Been On The Goods At Issue In This Case Since 1989

As demonstrated *supra*, OBC **first** used the ROGUE mark on clothing nationwide, and has used the mark **continuously** since 1989. *See supra* Sections IA & B. The parties agree that clothing generally, as opposed to specific items of clothing, are the goods at issue, and that the parties sell the same goods under the ROGUE mark – indeed, that identity of goods is the thrust of Excelled's claims. (Dkt. No. 1 ¶¶ 31, 36, 41, 47, 54, 60.) Because OBC has used the mark ROGUE on clothing throughout the United States for 13 years before Excelled's federal trademark registration issued in December 2003 (and for 10 years before Excelled's first admitted use of the mark), and continued its use until the present day, Excelled cannot establish trademark ownership and OBC is entitled to prevail on its prior user defense.

### II. ALTERNATIVELY, SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST EXCELLED ON COUNTS I AND II BECAUSE OF OBC'S UNCLEAN HANDS DEFENSE

In the alternative, summary judgment should be entered against Excelled on Counts I and II based on OBC's affirmative defense of unclean hands. The trademark registrations that Excelled asserted against OBC in these counts were obtained by fraud on the PTO, because Excelled obtained expanded rights by falsely swearing to the PTO that it was using the mark on goods, including children's clothing, shirts, vests, and pants, that it was no longer selling or had never sold. It would be inequitable to permit Excelled to profit from its ill-gotten registrations.

### A. Fraud on the PTO Supports a Defense of Unclean Hands

Fraud on the PTO supports an unclean hands defense. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1355 (E.D.N.Y. 1994) ("Section 32(b) denies even an

incontestable registrant the benefit of their trademark where that party's use of the mark is tainted with inequity or bad faith."); *Duffy-Mott Co., Inc. v. Cumberland Packaging Co.*, 424 F.2d 1095, 1098-99 (CCPA 1970) (a false affidavit that the mark is being used on goods that it is not being used on is sufficiently inequitable to give rise to an unclean hands defense). *See generally* 6 McCarthy § 31:56 ("If plaintiff is suing for infringement of a registered mark, his fraud in the procurement of the registration may constitute unclean hands.") (collecting cases). "[W]hat is material is not that the plaintiff's hands are dirty, but that [it] dirtied them in acquiring the right [it] now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants*." Havana Club Holding, S.A. v. Galleon, S.A.*, 49 U.S.P.Q.2D (BNA) 1296, 1998 U.S. Dist. LEXIS 4065, at *18 (S.D.N.Y. Mar. 31, 1998) (internal citation omitted). Thus, OBC's unclean hands defense can bar Excelled's claims if OBC demonstrates that Excelled committed fraud in obtaining the federal trademark registrations that it is now asserting against OBC. *See id.*

Fraud on the PTO is demonstrated by clear and convincing evidence that "the statements (1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application." *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 241 (E.D.N.Y. 2009); *see also Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 270 (2d Cir. 2011) (requisite scienter for a finding of fraud is that "the person making the representation knew or should have known that the representation was false."). It is axiomatic that a party commits fraud if it knowingly represents to the PTO that it is using the mark on goods when it is not doing so, because the PTO relies on this representation to issue registration for those goods. *E.g., Torres v. Cantine Torresella*, 808 F.2d 46, 49 (Fed. Cir. 1996) (cancelling registration in part because plaintiff swore that mark was in use on wine, vermouth and champagne, when in fact the mark

was only in use on wine); *Mister Leonard, Inc. v. Jacques Leonard Couture, Inc.*, 1992 TTAB LEXIS 8, 23 U.S.P.Q.2d 1064 (TTAB Apr. 22, 1992) (registration cancelled for fraud because of false Section 8 and 15 declaration that stated that the mark was used on all of the goods specified in the registration for the five years from the date of the registration when in fact it was not being used on one of the goods); *Gen. Car & Truck Leasing Sys., Inc. v. Gen. Rent-A-Car, Inc.*, 17 U.S.P.Q.2d 1398, 1990 U.S. Dist. LEXIS 12749, *7-8, 10 (S.D. Fla. July 11, 1990) (affirming TTAB cancellation of registration because plaintiff filed Section 8 and 15 declaration stating that he was using the mark on all of the service in one class, when in fact he was only using the mark on some of the services); *Polo Fashions v. Extra Special Prods, Inc.*, 208 U.S.P.Q. (BNA) 421, 1980 U.S. Dist. LEXIS 16290, at *6-7 (S.D.N.Y. Mar 5, 1980) (filing renewal affidavits to maintain registration of mark not in use is fraud). *See generally* 3 Anne Gilson LaLonde, *Gilson on Trademarks* §11.08[3][a][iii] ("If the mark is not in fact being used on the claimed goods or services, a court may find fraud.").

Fraud with regard to even a single item in either an application for registration or in a Section 8 or 15 Declaration is sufficient to cancel the entire registered class. *Meckatzer Lowenbrau Benedikt Weiss KG v. White Gold, LLC*, 95 U.S.P.Q.2D (BNA) 1185, 2010 TTAB LEXIS 132, at *8 (TTAB 2010) ("A finding of fraud with respect to a particular class of goods or services renders any resulting registration void as to that class."); *Mister Leonard*, 1992 TTAB LEXIS, at *1, 10 (cancelling entire registration for "dresses, pants, ski wear, tennis wear, hats, coats and raincoats for women, scarves and bathing costumes for men and women, ties" because registrant had lied about selling "bathing costumes for men"). Because Excelled's registrations are each for only one class – Class 025 – if at the time Excelled applied to register each of its

marks it was not using the mark on even a single one of the goods it claimed, its submission was fraudulent and its entire registration can be cancelled.

## B. Excelled's Registrations for its ROGUE-Formative Marks Were Obtained By Fraud

### 1. Excelled's ROGUE Registration

In Excelled's November 15, 2004 application to register the trademark ROGUE with the PTO, William Goldman swore that Excelled was using the trademark on all of the goods in the application. Those goods specifically included "men's, ladies' and children's clothing, namely coats, jackets, vests, shirts and pants." (SOF ¶ 66.) This declaration was fraudulent because in November 2004, Excelled was not using the mark ROGUE on **pants**, **shirts**, or **children's clothing**. (SOF ¶¶ 63, 64, 67.) In fact, the evidence is that Excelled **never** used the mark on children's clothing before November 2004, and had not used the mark on shirts in 2004. (SOF ¶¶ 63 & 64.); *see Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1983) (affirming district court's cancellation because, among other things, registrant's "claimed scope of use of the registered marks had been exaggerated" and the continuous use claimed in the section 8 and 15 declarations was "sporadic, at best."). Excelled's misrepresentations in its ROGUE application were material: The TTAB would not have registered the ROGUE mark for shirts, pants, and children's clothing if Excelled had not represented that it was selling those goods as of November 2004. *See Mister Leonard,* 1992 TTAB LEXIS 8, at *5 (registrant's false statements that the mark had been used on men's bathing costumes continuously for the past 5 years was material because as a result of it, " the registration obtained the status of incontestability with regard to bathing costumes for men when it should not have."). And Excelled cannot argue that these misrepresentations were inadvertent when the application had been signed by William Goldman – Excelled's President –whom

Excelled had also identified as the person most knowledgeable about Excelled's sales.  (SOF ¶¶ 59 & 67.)   The evidence is ample that Excelled made the statements with an intent to fraudulently expand its rights by defrauding the PTO.  *See  Mister Leonard,* 1992 TTAB LEXIS, at *6-8 (rejecting the registrant's defense that its false statements were inadvertently made because the statements had originated with the registrant's Chief Executive Officer, whom registrant had identified as "the person most familiar with registrant's past and/or present use of [the mark].");  *Zanella Ltd. v. Nordstrom, Inc.*, 90 U.S.P.Q.2D (BNA) 1758, 2009 TTAB LEXIS 365, at *5 (TTAB 2009) ("[registrant] is charged with knowing what it is signing" and failing to make an appropriate inquiry is a "reckless disregard for the truth") (quoting *Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 186 Fed. Appx. 1005, 77 USPQ2d 1917, 1928 (TTAB 2006)).

Finally, it is worth noting that OBC need only show that Excelled committed fraud on the PTO as to <u>any one of the items </u>(shirts, pants, or children's clothing) to invalidate an entire class of a registration and to support a finding of unclean hands.  *See Mister Leonard,* 1992 TTAB LEXIS 8, at *5 (finding that registrant was not using the mark on one item of clothing was sufficient to cancel the entire class); *Meckatzer*, 2010 TTAB LEXIS 132, at *8 (non-use of mark on one item constitutes fraud); *Dial-A-Mattress*, 841 F. Supp. at 1355 (fraud on the PTO supports an unclean hands defense).  Where, as here, the entire registration consists of a single class, a finding of fraud as to any single good is sufficient to cancel the entire registration. *Mister Leonard,* 1992 TTAB LEXIS 8, at *5 (finding that registrant was not using the mark on one item of clothing was sufficient to cancel the entire registration, which consisted of only one class).

### 2. Excelled's ROGUE LEATHER BY REILLY OLMES Registration

Excelled filed a "Combined Declaration of Use and Incontestability Under Section 8 and 15" for its ROGUE LEATHER BY REILLY OLMES registration on December 9, 2009.  (SOF ¶ 69.)  In this filing, Excelled stated under penalty of perjury that 1) it had been using the ROGUE LEATHER BY REILLY OLMES mark on **all** of the goods in the registration (which includes, among other things, children's clothing and shirts, vests, and pants, all substantially made of leather) continuously for the prior five years and 2) the mark was currently in use on **all** of the goods in the registration.  (*Id.*)  However, the evidence shows that Excelled did not use the ROGUE LEATHER BY REILLY OLMES mark on **children's clothing made in whole or in substantial part of leather** at any time between 2004 and December 9, 2009; it did not use the mark on **vests made in whole or in substantial part of leather** between 2005 and December 9, 2009; it did not use the mark on **pants made in whole or in substantial part of leather** between 2006 and December 9, 2009; and it did not use the mark on **shirts made in whole or in substantial part of leather** between 2004 and December 9, 2009.  (SOF ¶¶ 65, 70.)

Excelled's statements in its Section 8 and 15 Declaration that it was using the mark on all the goods in the registration and that it had used the mark on all these goods continuously for the past five years were **materially** false, because as a result of these statements "the registration obtained the status of incontestability with regard to [children's clothing, shirts, pants, and vests] when it should not have."  *Mister Leonard,* 1992 TTAB LEXIS, at *5; *see also Orient Express Trading Co.*, 842 F.2d at 653; *Torres*, 808 F.2d at 49; *Gen. Car & Truck*, 1990 U.S. Dist. LEXIS 12749, at *6.  And Excelled made these statements **knowingly and with an intent to deceive** – the Section 8 and 15 Declaration was signed by William Goldman, Excelled's President and Rule 30(b)(6) designee on the topic of Excelled's history of sales, who knew that the statements

18

were false. *See Mister Leonard*, 1992 TTAB LEXIS, at *6-8 (rejecting the registrant's defense that its false statements were inadvertent because the statements had originated with the registrant's Chief Executive Officer, whom registrant had identified as "the person most familiar with registrant's past and/or present use of [the mark].")); *Zanella*, 2009 TTAB LEXIS 365, at *5 ("[registrant] is charged with knowing what it is signing" and failing to make an appropriate inquiry is a "reckless disregard for the truth"). Because Excelled's registration for ROGUE LEATHER BY REILLY OLMES only contains a single class, the entire registration may be cancelled as a result of the fraud. *E.g.*, *Meckatzer*, 2010 TTAB LEXIS 132, at *8.

### 3. Excelled's REILLY OLMES ROGUE LEATHER Registration

On February 23, 2010, Excelled, through William Goldman, executed a "Declaration of Use and/or Excusable Nonuse of Mark in Commerce Under Section 8" in connection with its REILLY OLMES ROGUE LEATHER registration. (SOF ¶ 72.) In that declaration, Excelled swore that the mark was "in use in commerce on or in connection with the goods and/or services identified above[,]" including "men's women's and children's clothing made in whole or in substantial part of leather, namely, coats, vests, shirts, and pants." (*Id.*) This statement was fraudulent: the evidence shows that Excelled did not use the REILLY OLMES ROGUE LEATHER mark on **children's clothing made in whole or in substantial part of leather** at any time between 2004 and, February 23, 2010 – the date the affidavit was filed; it did not use the mark on **vests made in whole or in substantial part of leather** between 2005 and February 23, 2010; it did not use the mark on **pants made in whole or in substantial part of leather** between 2006 and February 23, 2010; and it did not use the mark on **shirts made in whole or in substantial part of leather** between 2004 and February 23, 2010. (SOF ¶¶ 66, 73.)

As explained *supra* with regard to Excelled's other fraudulent registrations, Excelled's false statements regarding its use of the REILLY OLMES ROGUE LEATHER mark were material, because it allowed Excelled to sustain its registration with regard to goods to which it had no actual rights. *See supra* Section II-B 1&2. Those false representations were knowingly and intentionally deceptive because Mr. Goldman, as the President of Excelled, the signor of all of Excelled's declarations to the PTO, and the person designated as most knowledgeable about Excelled's history of sales, knew that Excelled was not selling children's clothing, shirts, pants, or vests made in whole or in substantial part of leather under the REILLY OLMES ROGUE LEATHER mark when he signed the Section 8 Declaration. *See Gen. Car & Truck*, 1990 U.S. Dist. LEXIS 12749, at *6 ("fraud occurs when an applicant or registrant makes a false material representation that the applicant or registrant knew or should have known was false.")*; see also Mister Leonard*, 1992 TTAB LEXIS, at *6-8.

**4.    OBC's Fraud Argument is Bolstered by the Expert Testimony of Kenneth B. Germain**

Professor Kenneth B. Germain, a widely-recognized expert on rules and procedures in the United States Patent & Trademark Office, has rendered an expert opinion that Excelled's sworn statements to the PTO contained in the original application for the registration for ROGUE and contained in the renewal applications for the ROGUE LEATHER BY REILLY OLMES and REILLY OLMES ROGUE LEATHER were false, material, and made with the intent to induce the PTO to grant rights in reliance on the false statements. (SOF ¶ 74). As Mr. Germain opined, but for Excelled's false statements of use, the PTO would not have issued Excelled's registration for ROGUE for children's clothing and shirts. (*Id.*) But for Excelled's false statements of use, the PTO would not have allowed Excelled to maintain its registrations for ROGUE LEATHER

BY REILLY OLMES and REILLY OLMES ROGUE LEATHER for children's clothing made in whole or in substantial part of leather. (*Id.*) Based on his expertise in PTO procedures and practice, Mr. Germain opined that Excelled's false statements "were made intentionally to induce the PTO to grant rights in reliance on them." (*Id.*) (the false "trademark filings at issue all were signed by William Goldman, who had intimate knowledge of the company's product lines, having worked at the company since his graduation from college in 1992, and who was, in fact, designated as the company's 30(b)(6) witness.")).

## III. SUMMARY JUDGMENT MUST INDEPENDENTLY BE ENTERED ON COUNT IV FOR FAILURE TO PROVE HARM TO CONSUMERS

In addition, Count IV of Plaintiff's Complaint must be dismissed for the independent reason that Plaintiff has failed to allege or prove facts that state a claim under N.Y. Gen. Bus. Law § 349. To establish a prima facie claim of deceptive business practices under this section, a plaintiff must show: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Eyal R.D. Corp. v. Jewelex N.Y. Ltd.*, 784 F. Supp. 2d 441, 449 (S.D.N.Y. 2011). This Court has repeatedly held that "garden-variety trademark infringement" does not state a claim under § 349 unless there is proof of some consumer injury above and beyond the typical customer confusion that trademark laws are intended to address. *See, e.g.*, *Luv N' Care, Ltd. v. Walgreen, Co.*, 695 F. Supp. 2d 125, 136 (S.D.N.Y. 2010) ("[I]t is well-established that trademark infringement actions alleging only general consumer confusion do not threaten . . . direct harm to consumers for purposes of stating a claim under section 349.") (quotation omitted); *Eliya, Inc. v. Kohl's Dep't Stores*, 82 U.S.P.Q.2d 1088, 2006 U.S. Dist. LEXIS 66637, at *22 (S.D.N.Y. Sept. 13, 2006) ("[F]or the statute to apply, a plaintiff must establish a direct harm to consumers that is greater

than the general consumer confusion commonly found in trademark actions, . . . such as potential danger to the public health or safety."); *see also Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No 08 Civ. 0068, 2010 U.S. Dist. LEXIS 52795, at *19 (E.D.N.Y. Mar. 11, 2010) (Report & Rec.) (collecting cases).

Because Plaintiff has failed to allege any harm beyond generalized consumer confusion, and has failed to produce even evidence of that (insufficient) harm, summary judgment must be entered on Count IV of its Complaint. *See, e.g., Lifeguard Licensing Corp. v. Gogo Sports, Inc.*, 10-cv-9075, 2013 U.S. Dist. LEXIS 115668, at *24-25 (S.D.N.Y. Aug. 15, 2013) (entering summary judgment because plaintiff's "alleged injury consists solely of confusion, mistake and deception among the  general purchasing public"); *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10-cv-1615, 2012 U.S. Dist. LEXIS 47313, at *45-46 (S.D.N.Y. Mar. 30, 2012) (same – "it is clear that the core of MPC's deceptive practices claims is nothing more than its garden-variety trademark infringement dispute").

## CONCLUSION

For the foregoing reasons, OBC seeks summary judgment on all of Excelled's claims (Counts I – V) based on OBC's prior ownership of the ROGUE mark.  Alternatively, OBC seeks summary judgment on Counts I and II of Excelled's claims based on OBC's unclean hands defense, and on Count IV because Excelled has failed to plead or prove injury to consumers.

Dated:  December 13, 2013

McDERMOTT WILL & EMERY LLP

By:  /s/_____

Monica S. Asher
340 Madison Avenue
New York, New York  10017
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444
Email:  masher@mwe.com

John J. Dabney (admitted *pro hac vice*)
Mark H. Churchill (admitted *pro hac vice*)
Katie Bukrinsky (admitted *pro hac vice*)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C.  20005-3096
Telephone: (202) 756-8000
Facsimile: (202) 756-8087
Email: jdabney@mwe.com, mchurchill@mwe.com,
kbukrinsky@mwe.com

*Attorneys for Oregon Brewing Company*