UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



EXCELLED SHEEPSKIN & LEATHER
COAT CORP.,

                                Plaintiff,

        -against-

OREGON BREWING CO.,

                                Defendant.

MEMORANDUM DECISION
AND ORDER

12 Civ. 01416 (GBD) (RLE)

GEORGE B. DANIELS, United States District Judge:

Plaintiff Excelled Sheepskin & Leather Coat Corporation ("Excelled") brought this declaratory

judgment action against Oregon Brewing Company ("OBC"), on February 24, 2012, to enjoin OBC from

using the Rogue mark in trade channels other than OBC's own brewpubs and website as compliments to

and in promotion of its brewing and beverage business.[1]  ECF No. 1 (the "Complaint").  Excelled sells

clothing and footwear under a family of marks containing the word Rogue (the Rogue "Marks").

Excelled SUF ¶¶ 1-5.[2]  OBC operates brewpubs and sells beer under the mark Rogue, and sells related

Rogue-branded clothing through its brewpubs, distillery pubs, brewery, bed and breakfasts, and hop farm;

as well as through mail order purchases, and distributors and brokers.  OBC SUF ¶¶ 13-33.

---

[1] Excelled asserts claims for Trademark Counterfeiting under 15 U.S.C. § 1114(1)(b) (Count I), Trademark Infringement under 15 U.S.C. § 1114(l)(a) (Count II), False Designation of Origin and Unfair Competition under 15 U.S.C. § 1125(a) (Count III), Unfair Trade Practices under N.Y. Gen. Bus. Law § 349 (Count IV), and Trademark Infringement under common law (Count V).  ECF No. 1.

[2] "OBC SUF" refers to OBC's Local Rule 56.1 Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.  ECF No. 59.  "Excelled SUF" refers to Excelled's Local Rule 56.1 Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.  ECF No. 65.  "Excelled CSUF" refers to Excelled's Local Rule 56.1 Counterstatement of Material Facts, filed in response to OBC's SUF.  ECF No. 84.  "OBC CSUF" refers to OBC's Local Rule 56.1 Counterstatement of Material Facts, filed in response to Excelled's SUF.  ECF No. 86.

OBC filed a five-count counterclaim, asserting various trademark claims as well as a breach of contract claim. ECF No. 37.[3]  In response, Excelled seeks declaratory judgment relief.[4]  ECF No. 39.

Excelled moved for summary judgment in its favor as to its own claims, and dismissal of OBC's counterclaims. ECF No. 61.  OBC filed a motion for summary judgment, seeking to dismiss Excelled's claims. ECF No. 56.

Excelled's motion for summary judgment in its favor as to Counts I-III and V of its Complaint, and dismissing all of OBC's counterclaims, is GRANTED.  Excelled's motion for summary judgment with respect to Count IV of its Complaint is DENIED.

OBC's motion for summary judgment dismissing Count IV of Excelled's Complaint is GRANTED.  OBC's motion for summary judgment to dismiss Counts I-III and V of Excelled's Complaint is DENIED.

## Background[5]

Founded in 1927, Excelled is an apparel company based in New York City.  Excelled SUF ¶ 1.  In or around January of 2000, Excelled began selling a line of clothing products with the Rogue mark in department and clothing stores.  Id. ¶ 2.  Since that time, Excelled has continuously sold such products directly or through its related company RG Apparel.  Id.; Decl. of William Goldman in Supp. of Pl.'s Mot. for Summ. J. ("Goldman Decl.") ¶ 3, ECF No. 62.

---

[3] Specifically, OBC asserts claims for Trademark Infringement, Unfair Competition and False Designation of Origin under 15 U.S.C. § 1114 (Count I), Trademark Infringement, Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125 (Count II), Trademark Infringement, Unfair Competition and False Designation of Origin under common law (Count III), Trademark Cancellation (Count IV), and Breach of Contract (Count V). ECF No. 37.

[4] Specifically, Excelled sought a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 that: (a) the Cross-License Agreement between OBC and Chinook Trading Country ("Chinook") is rescinded and is null and void in its entirety; (b) Excelled never became a licensee of OBC; (c) Excelled never lost, and OBC never gained the benefit of, Excelled's prior rights in the mark Rogue under the so-called "merger" doctrine or any other theory; and (d) that OBC has no license from Excelled to sell products under the mark Rogue. ECF No. 39.

[5] The following facts are undisputed, except where indicated.

Excelled has always sold its Rogue clothing in department and clothing stores such as Nordstrom. Excelled SUF ¶¶ 5, 9, 10; Goldman Decl. ¶¶ 2, 3.  Excelled has also sold its products at other department stores such as Saks, Macy's, Neiman Marcus and many smaller clothing stores, as well as through its website (www.rogue.us.com) and other websites.  Excelled SUF ¶¶ 5-6; Goldman Decl. ¶ 4.

Excelled's Rogue clothing products are advertised via print and Internet advertising, on Excelled's website www.rogue.us.com, and in magazines and other publications with nationwide circulation. Excelled SUF ¶ 7; Goldman Decl. ¶ 5; Decl. of Ross Q. Panko in Supp. of Excelled Sheepskin & Leather Coat Corp.'s Mot. for Summ. J. ("Panko Decl."), Ex. E, ECF No. 63.  From 2000 through 2012, Excelled sold over $30,000,000 in clothing products under its Rogue Marks through department and clothing stores.  Goldman Decl. ¶ 7; see Panko Decl., Exs. CC-NN.

Excelled filed its first application to register its Rogue mark with the United States Patent and Trademark Office ("PTO") in April 2000.  Excelled SUF ¶ 2; Goldman Decl. ¶ 9.  Since then, Excelled has obtained a series of additional Rogue trademarks.[6]

OBC was founded in 1988 and commenced operations as a commercial brewery that same year with production of "Rogue Ales" in Ashland, Oregon.  Decl. of Brett M. Joyce in Supp. of Def. Oregon Brewing Company's Mot. for Summ. J. on Pl.'s Claims ("Joyce Decl.") ¶ 6, ECF No. 58.  OBC has sold alcohol beverages, related clothing, and other merchandise bearing the mark Rogue since 1989.  Id. ¶ 11.

OBC has sold and distributed Rogue-branded clothing through its brewpubs, distillery pubs, brewery, bed and breakfasts, and hop farm since the Company's inception.  Id. ¶ 14; OBC SUF ¶ 13.  It has been OBC's consistent practice to provide its beer distributors with related Rogue-branded clothing

---

[6] (i) Reg. No. 2,790,074 ROGUE LEATHER BY REILLY OLMES for "men's, women's and children's clothing made in whole or in substantial part of leather, namely, coats, vests, shirts and pants" (issued: December 9, 2003); (ii) Reg. No. 3,260,143 ROGUE for "footwear" (issued: July 10, 2007); (iii) Reg. No. 3,346,559, ROGUE, for "men's, ladies' and children's clothing, namely, coats, jackets, vests, shirts and pants" (issued: December 4, 2007); and (iv) Reg. No. 3,945,523 ROGUE STATE for "men's, ladies' and children's clothing, namely, coats, jackets, vests, shirts and pants" (issued: April 12, 2011 ).  Excelled SUF ¶ 3; Goldman Decl. ¶¶ 10, 11.

and other merchandise.  See Joyce Decl. ¶ 22.  Each time a distributor first sold Rogue ales or spirits in a given state, it also purchased or received Rogue-branded clothing for ultimate sale or distribution to retail establishments and individual consumers.  Id.  By the year 2000, dozens of distributors had distributed OBC's Rogue-branded clothing to consumers throughout the United States.  Id.  ¶ 23.

In addition, OBC has also sold its Rogue-branded beer and clothing at numerous beer festivals and events throughout the United States.  Id. ¶ 35.  For example, OBC has sold Rogue-branded beer and merchandise since at least the mid-1990s at festivals in Denver, CO; Arizona; Syracuse, NY; Asheville, NC; and Kona, HI.  Id.  As early as 1994, and continuously since that time, OBC had also sold its Rogue-branded clothing to consumers by mail order.  Id. ¶ 27.

In 1995, the retail superstores Fred Meyer and Cost Plus became the first third-party retailers to sell OBC's Rogue-branded clothing.  Id. ¶ 29.  Prior to 2000, OBC's Rogue-branded clothing was also sold in other third-party retailers such as Ashton Food Market, Brewery Collectibles, C&K Market, John's Grocery, Made in Oregon, and Oregon's Best.  Id. ¶ 30.  In the last decade, OBC's Rogue-branded clothing has been sold in additional retail stores throughout the United States and on multiple retail websites, including Beer Clothing Co., Crazy Shirts, Portland State University's bookstore, sharpedgebeer.com, and Whole Foods.  Id. ¶ 32.  Prior to 2011, OBC did not sell Rogue-branded clothing in any location that did not also sell its beverage products.  Excelled SUF ¶ 59 (citing to Feb. 22, 2013 Dep. of Brett Joyce, Panko Decl., Ex. OO at 196:20-24).

In 2011, for the first time, OBC began selling separately its Rogue-branded clothing in department and clothing stores such as Urban Outfitters, Nordstrom, and Sears.  Id.; Joyce Decl. ¶ 33.  The following year, OBC also began offering and selling its Rogue-clothing through its online store on the eBay and Amazon websites.  Joyce Decl. ¶ 34.

On August 24, 2005, OBC filed an application with the PTO to register its Rogue mark for

"clothing, namely, t-shirts, sweatshirts, polo shirts, turtlenecks, aprons, hats." Panko Decl., Ex. I.[7]  In its

response on March 13, 2006, the PTO stated that "potentially conflicting marks in a [sic] prior-filed

pending applications may present a bar to registration" due to a possible likelihood of confusion.  Panko

Decl., Ex. J at 2.  Enclosed with the response was information regarding PTO Application Nos. 76620735

("'735 application"), owned by Excelled, and 78471291 ("'291 application"), owned by Chinook Trading

Co. and later assigned to Excelled.  Id. at 4, 6; see Panko Decl., Ex. O at 6.

On June 22, 2007, OBC filed a response to the PTO's March 2006 Office Action, in which OBC

amended the identification of the goods in its application to: "clothing, namely, t-shirts, sweatshirts, polo

shirts, turtlenecks, aprons, hats and not including jackets, coats and skirts."  Panko Decl., Ex. K at 1.

OBC further informed the PTO that, after nearly six months of negotiations between OBC and Excelled,

the parties had reached an agreement (the "2007 Settlement Agreement") reflecting that "so long as [the

parties] use their respective marks in well-defined ways on well-defined and, under the commercial

realities of the parties operations, non-overlapping goods, there will be no likelihood of confusion."  Id. at

2.  OBC explained in its response to the PTO that, as part of the settlement, Excelled had agreed to

abandon its '291 application and amend its '735 application to refer only to: "men's, women's and

children's clothing, namely, jackets, coats and skirts."  See Panko Decl., Ex. O at 1-2.[8]

---

[7] Both parties agree that OBC became aware of Excelled's use of the Rogue mark sometime in 2005.  OBC CSUF ¶ 16 (citing to Decl. of Douglas Hancock ¶ 5); Excelled SUF ¶ 16.

[8] In 2011, OBC filed a lawsuit against Excelled in Oregon state court for breach of contract, seeking specific performance of the 2007 Settlement Agreement on the grounds that Excelled had yet to amend the list of goods in its trademark registration, as specified in the Agreement.  Panko Decl., Ex. S; Excelled SUF ¶ 29; OBC Am. Answer & Countercl. at 19.  The Multnomah County Circuit Court denied OBC's motion for summary judgment and granted Excelled's cross-motion for summary judgment, on the grounds that the Agreement had been terminated.  Panko Decl., Ex. T.  OBC appealed the decision, OBC Am. Answer & Countercl. at 20, and the Oregon Court of Appeals affirmed without opinion.  See Oregon Brewing Co. v. Excelled Sheepskin & Leather Coat Corp., No. 110303863 (Or. Ct. Ap., filed June 25, 2014).

On June 26, 2007, the PTO issued a Notice of Suspension pending the disposition of Excelled's

'735 application.  Panko Decl., Ex. L.  The PTO determined that OBC's amendment excluding particular

articles of clothing was "not enough to overcome a likelihood of confusion with an identical mark on

other items of clothing."  Id. at 2.  The PTO further explained that "[n]either the applicant's application

nor the prior pending application contain any limitations regarding trade channels for the goods and

therefore it is assumed that registrant's and applicant's goods are sold everywhere that is normal for such

items, i.e., clothing and department stores."  Id. at 2.

On July 23, 2007, OBC filed a response to the PTO's suspension notice in which it further

amended its application to: "clothing, namely, t-shirts, sweatshirts, polo shirts, turtlenecks, aprons, hats,

and not including jackets, coats and skirts, sold primarily in the trademark owner's brewpubs and web

site, as compliments [sic] to and in promotion of the trademark owner's brewing and beverage

businesses."  Panko Decl., Ex. M at 1.  OBC stated in this response that "[w]here the subject application

has been amended to delineated trade channels that are owned, operated and controlled by the Applicant,

and where the goods are sold as compliments [sic] to and in promotion of Applicant's primary products,

there is no likelihood that consumers would be confused by the mark of the '735 application."  Id. at 2.  In

light of these amendments, OBC's trademark was granted on January 8, 2008 as U.S. Registration No.

3,365,653.  Panko Decl., Ex. N.

### Legal Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving

party.'"  Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson v. Liberty Lobby, 477

U.S. 242, 248 (1986)).  A fact is material when "it 'might affect the outcome of the suit under the governing law.'"  Id. (quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.  See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, it "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation."  Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2002) (citations and quotations omitted).  Rather, the non-moving party must produce admissible evidence that supports its pleadings.  See First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968).  In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment."  Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.  See Niagara Mohawk, 315 F.3d at 175.  Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Marvel, 310 F.3d at 286 (citations and quotations omitted).

### Trademark Infringement Claims

Counts I-III and V of Excelled's Complaint, and Counts I-III of OBC's counterclaims assert claims for trademark counterfeiting, infringement, unfair competition and false designation of origin

under the Lanham Act, 15 U.S.C. §§ 1114, 1125 and common law.  The Lanham Act protects the first

user of a trademark by barring a later user from employing a similar mark that can confuse purchasers and

besmirch the reputation of the first user.  See Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 742

(2d Cir. 1998).  In order to prevail on its Lanham Act claims, the party must show (1) that it has a valid

mark that is entitled to protection and (2) that the infringer's actions are likely to cause confusion between

the products.  See Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).[9]

1.  Excelled Has Established the Validity of its Marks

As noted, the first prong of the test for trademark infringement requires that a party's mark be

entitled to protection.  Registration of a mark "enables the owner to sue an infringer under § 32, 15 U.S.C.

§ 1114," and "entitles the owner to a presumption that its mark is valid, see § 7(b), 15 U.S.C. § 1057(b)."

Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000).  "A certificate of registration with

the PTO is prima facie evidence that the mark is registered and valid (i.e., protect[a]ble), that the

registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."

Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999).  Excelled's

certificates of registration of the Rogue marks give rise to a statutory presumption that its marks are valid.

See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 224 (2d Cir.

2012).

In its motion for summary judgment, Excelled asserts that OBC is infringing its rights to the

Rogue trademark, contending that (1) Excelled possesses valid rights to the Rogue mark, and (2) its rights

are superior to those of OBC with respect to sales in department and clothing stores.  See Excelled Mem.

---

[9] The same standard that applies to the parties' Lanham Act claims also applies to their unfair competition and common law trademark claims.  See Info. Superhighway, Inc. v. Talk Am., Inc., 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (granting summary judgment on Lanham Act and unfair competition claims because standard for both claims is the same); Pirone v. MacMillan, Inc., 894 F.2d 579, 581-82 (2d Cir. 1990) (requiring plaintiff to establish the same elements to prevail on statutory and common law trademark infringement claims); FragranceNet.com, Inc. v. FragranceX.com, 493 F. Supp. 2d 545, 548 (E.D.N.Y. 2007) ("[T]he elements necessary to prevail on common law cause of action for trademark infringement and unfair competition mirror Lanham Act claims.").

at 11-12. Excelled maintains that OBC has failed to raise a triable issue of fact as to whether it has senior nationwide common law rights in the Rogue mark that extend to clothing products sold in department and clothing stores. See Excelled March 11, 2014 Letter, ECF No. 102, at 2. Further, Excelled argues that OBC's clothing has always been sold primarily through its brewpubs and website, as complements to and in promotion of OBC's brewing and beverage businesses—consistent with its federal registration. Id.

In opposition, OBC argues that Excelled cannot prove that it is entitled to summary judgment because the undisputed facts show that OBC is the senior user of the ROGUE mark for clothing. See OBC Opp'n at 1. OBC contends that in assessing a party's claim of common law priority, consideration of the markets in which the products are sold is irrelevant. Id. at 6 ("[T]he question of what trade channels the parties' goods were sold is not relevant to determining ownership."); see also OBC CSUF at 40 (disputing Excelled's "legal argument that trade channels are relevant to determining who has prior rights to the ROGUE mark for clothing in this case"). Instead, OBC argues that its prior sales "through a wide variety of trade channels" gave OBC "nationwide, common law priority for ROGUE clothing, without limitation." OBC CSUF at 40.[10]

The first use of a mark does not give absolute power to exclude a junior user as to all goods or services and across all markets. See Talk To Me Prods., Inc. v. Larami Corp., 804 F. Supp. 555, 559 (S.D.N.Y. 1992) ("The exclusive right to a distinctive mark belongs to the one who first uses it *in connection with a particular line of business*.") (emphasis added), aff'd, 992 F.2d 469 (2d Cir. 1993). Ownership of a mark does not rest solely upon the actual calendar date of first usage, but also upon many

---

[10] OBC concedes, however, that Excelled has the right to sell jackets, coats and skirts with the Rogue mark in department and clothing stores, but argues that Excelled does not have the right to sell t-shirts, sweatshirts, and hats in clothing stores. See Mar. 4, 2014 Oral Arg. Tr., ECF No. 105, at 34-35 ("[M]y client is taking the position that it does not have the right to sell jackets or the things [Excelled is] doing . . . We're not trying to stop them from selling coats, skirts, or jackets . . . We're just saying you can't sell overlapping goods."). OBC's concession is a tacit recognition of the validity of Excelled's trademarks. Although OBC argues that Excelled's trademarks are limited to jackets, coats, and skirts, the PTO expressly rejected such a limitation based on distinctions between items of clothing, finding that it was insufficient to prevent a likelihood of confusion. See Panko Decl., Ex. L.

other variables highlighted by the surrounding circumstances of the use.  See S.C. Johnson & Son v.

Johnson et al., 175 F.2d 176, 179 (2d Cir. 1949) (noting that to apply a principal of pure temporal priority

would "frequently result in great hardship to others, and give to the first user of a mark a wholly

unjustified power to preempt new markets").  As noted in S.C. Johnson & Son, the interest of a senior

user to expand into a market which the second user has begun to exploit, must be "weighed against the

second user's interests."  Id. at 180; see also 4 McCarthy on Trademarks and Unfair Competition

("McCarthy") § 24:20 (4th ed. 2014) ("A senior user cannot by expansion prevail where the result would

be a likelihood of confusion in derogation of established rights of the intervening user.").

It is undisputed that Excelled was the first to use and the first to register its Rogue marks for use

throughout the United States in the *department and clothing store* markets.  OBC has not presented any

evidence that prior to 2000, the date of Excelled's first Rogue federal registration for clothing, OBC had

conducted any sales that were not in connection with or in promotion of its beer business.  Further, OBC's

President, Brett Joyce, whose testimony OBC relies upon for most of its factual assertions in this case,

admitted during his Rule 30(b)(6) deposition that OBC did not begin selling Rogue clothing in department

and clothing stores until 2011 when it entered into an agreement with t-shirt manufacturer Palmer Cash.

See Excelled SUF ¶ 54.[11]  In addition, none of the documents produced by OBC show sales of Rogue

clothing through department and clothing stores prior to 2011.  Id. ¶ 61.  Thus, OBC has presented no

---

[11] Q. Okay. Now, you weren't really selling in any department stores and clothing stores in 2007, were you?  You weren't
selling any Rogue clothing products in those stores? ...
Q. Right?
A. No.
Q. No, you were not, correct?
A. That's correct.
Q. Okay. And your Rogue products really weren't sold in any department stores until you entered into the license with Palmer
Cash, isn't that correct? ...
A. I would say that is true, yes.  Feb. 22, 2013 Dep. of Brett Joyce at 67:7-25.

evidence upon which a reasonable juror could conclude that OBC has priority of the Rogue mark for the sale of clothing in department and clothing stores. See OBC Mem. at 11.[12]

Excelled, having established that it has priority of use of the Rogue mark for sales in the department and clothing store markets, is also entitled to summary judgment dismissing OBC's trademark counterclaims. See Patsy's Brand, Inc., 317 F.3d at 217; Menashe v. V Secret Catalogue, Inc., 409 F. Supp. 2d 412, 425 (S.D.N.Y. 2006) ("[B]ecause . . . Victoria Secret has acquired priority in the Mark . . . Plaintiffs are not entitled to a declaratory judgment of non-infringement under the Lanham Act or at common law."). OBC's trademark counterclaims are accordingly dismissed.

OBC also argues that any independent rights that Excelled may have owned to the Rogue mark for clothing which were superior in time to OBC's rights were extinguished at the time of the Trademark Transfer Agreement ("TTA") between Chinook and Excelled under the "merger rule." See OBC Am. Answer & Countercl. at 23; OBC Opp'n at 15.[13]  Under the merger rule, "[a] licensee's prior claims of any independent rights to a trademark are lost, or merged into the license, when he accepts his position as licensee, thereby acknowledging the licensor owns the marks and that his rights are derived from the licensor and enure to the benefit of the licensor." Dress for Success Worldwide v. Dress 4 Success, 589

---

[12] Even assuming, *arguendo*, that OBC once had such rights, "[w]hen a senior user delays in enforcing its rights, a junior user may acquire a valid trademark in a related field enforceable against even the senior user." Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 217 (2d Cir. 2003); see also Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc., 857 F.2d 80, 82 (2d Cir. 1988) ("The owner's rights in such appendant markets are easily lost; they must be asserted early, lest they be made the means of reaping a harvest which others have sown."); Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822, 825 (2d Cir. 1943) (same). From 2005 onward, after OBC became aware of Excelled's use of the Rogue mark for clothing, OBC could have objected to Excelled's use, but never did. If OBC were now permitted to sell clothing products bearing the Rogue mark in department and clothing stores, the same markets that Excelled has been selling clothing in since 2000, such similarities and overlap would increase the likelihood of consumer confusion detrimental to Excelled. Accordingly, OBC has lost any common law rights in the Rogue mark in connection with sales of clothing in department and clothing stores. See Patsy's Brand, Inc., 317 F.3d at 217.

[13] In its motion for summary judgment in the Oregon litigation, OBC took the exact opposite position it now takes before this Court – arguing that Chinook had breached the Cross-License Agreement by selling the sub-license to Excelled pursuant to the TTA, and requesting an order from the court invalidating the sale of the sub-license. Panko Decl., Ex. S ¶¶ 26-27.

F. Supp. 2d 351, 359 (S.D.N.Y. 2008) (citing Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc., 88 F.

Supp. 2d 914, 923 (C.D. Ill. 2000)).

As a threshold issue, OBC has failed to establish that Chinook's purported transfer of its interests

in their Cross-License Agreement was valid. See infra at 19-21. On September 24, 2010, Excelled and

Chinook purportedly executed the TTA. Under the terms of the TTA, Excelled was to acquire, *inter alia*,

"all of Chinook's rights and obligations under the Cross-License Agreement," between Chinook and

OBC. TTA, Panko Decl., Ex. V at 1. However, under the plain terms of that Cross-License Agreement,

the parties were expressly prohibited from assigning their rights under the agreement. Cross-License

Agreement, Panko Decl., Ex. U §§ 1.2, 1.4. Accordingly, Chinook's purported transfer of its interests in

the Cross-License Agreement with OBC is invalid and unenforceable against Excelled. See infra at 20.

Even assuming that such a transfer was valid under the Cross-License Agreement, application of

the merger rule is inappropriate in this case. Unlike other instances in which courts have applied the

merger rule, the licensing agreement at issue in this case was a cross-licensing agreement under which

both parties acquired each other's rights. Under the terms of the agreement both OBC and Chinook were

licensees and licensors. Chinook granted OBC the right to use its mark for clothing in countries outside

the U.S. where Chinook had rights, and OBC granted Chinook the right to use its mark for clothing in the

U.S. See Cross-License Agreement §§ C, E. Further, neither OBC nor Chinook acknowledged that its

rights were derived from the other party. Compare Dress for Success, 589 F. Supp. 2d at 362.[14] OBC's

argument is entirely inconsistent with its legal position in this litigation, where it claims it has superior

---

[14] In Dress for Success, two parties entered into a trademark licensing agreement pursuant to which Dress for Success
Worldwide ("Worldwide") granted Dress 4 Success ("D4S") a license to use the Dress For Success mark for seven years.
Pursuant to the licensing agreement, D4S explicitly "acknowledge[d] [Worldwide's] exclusive, right, title, and interest in and
to the Trademark." Id. at 362. After the licensing agreement was terminated, D4S continued to use the Dress For Success
mark and Worldwide moved for a preliminary injunction against D4S on the basis of trademark infringement. In granting
Worldwide's motion, the court found that pursuant to the merger rule, the licensing agreement extinguished whatever common
law rights D4S had previously held in the Dress For Success mark. Id. at 362-63.

rights to the Rogue mark based on its *common law* rights in the mark, not based on the Cross-License Agreement.

In addition, OBC asks this Court to apply the merger rule against Excelled, a third-party that did not enter into the Cross-License Agreement. OBC argues that by executing the TTA with Chinook, the terms of which expanded Excelled's rights and extinguished Chinook's, Excelled extinguished its prior trademark rights for which it had obtained numerous federal trademarks. There is no authority that supports the application of the merger rule against a third-party such as Excelled. Such an outcome would be inconsistent with prior applications of the merger rule, as well the intent of the parties to both the Cross-License Agreement and the TTA. Accordingly, Excelled has established that it has valid and enforceable trademarks rights in its Rogue marks.

2.   Excelled Has Demonstrated Likelihood of Confusion

Likelihood of confusion is a "key element" that a plaintiff must prove in order to prevail in a trademark infringement suit.  Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993).  To demonstrate likelihood of confusion, Excelled must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark."  Id.  The mere possibility of confusion is insufficient to meet this standard; rather, consumer confusion must be probable.  See Estee Lauder Inc. v. Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997).  "A probability of confusion may be found when a large number of purchasers likely will be confused as to the source of the goods in question."  Nora Beverages, Inc. v. Perrier Grp. of Am., 269 F.3d 114, 121 (2d Cir. 2001). [15]

Here, the parties do not dispute that there is a likelihood of confusion between their respective uses of the mark, because they are using an identical Rogue mark for clothing products sold in the same

---

[15] The factors used by the Second Circuit to assess likelihood of confusion were announced in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961): (1) Strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that

clothing and department store markets.  See Excelled Mem. at 14-15; OBC Opp. Mem. at 15 ("the

undisputed fact is there is currently a likelihood of confusion.").  Where, as here, the marks and goods are

nearly identical, the "focus in the second step shifts from likelihood of confusion to basic rules of

trademark priority to determine use and ownership of the mark."  Menashe, 409 F. Supp. 2d at 422–23

(internal quotation marks omitted); see also Buti v. Impressa Perosa, S.R.L., 935 F. Supp. 458, 468

(S.D.N.Y. 1996) ("When two or more companies adopt the same mark, basic rules of trademark priority

determine use and ownership of the mark.").[16]  As noted supra, Excelled has established that it has

priority to the Rogue mark for the sale of clothing in the department and clothing store markets.

In any event, a likelihood of confusion is independently established in the instant case based on

powerful presumptions of customer confusion because the parties are using identical marks in the same

stores.  See Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 274 (S.D.N.Y. 2002)

(finding that where two marks are identical and used for the same product, consumer confusion is

"inevitable"); Pappan Enters. Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 804 (3d Cir. 1998)

("[W]here the identical mark is used concurrently by unrelated entities, the likelihood of confusion is

inevitable . . . .").  Here, OBC does not dispute that the parties are using the same mark, on the same types

of clothing products, and that in 2011 OBC began selling such products in the same stores as Excelled.

---

the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the
relevant market.

[16] OBC argues that Excelled caused the likelihood of confusion by expanding the items of clothing it sold under the Rogue
mark.  See OBC Opp'n at 1 ("[T]he evidence is undisputed that Excelled caused the likelihood of confusion . . . .").  In support
of this argument, OBC offers the expert testimony and reports of Weston Anson.  See Opinions of Weston Anson in
Connection with the Parties' Mots. for Summ. J., Ex. A-C, ECF No. 70.  However, as this Court found supra, OBC does not
have protectable trademark rights in the Rogue mark for clothing that extend beyond sales as complements to and in promotion
of its beer business.  Accordingly, if a likelihood of confusion exists, as the parties concede it does, Excelled, not OBC, has the
right to eject infringing users such as OBC from the clothing and department store markets.

Accordingly, Excelled has established that there is no material issue of disputed fact as to likelihood of confusion.[17]

3.  OBC's Unclean Hands Defense Fails

"A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith" related to the matter at issue.  Cartier v. Symbolix, Inc., 386 F. Supp. 2d 354, 362 (S.D.N.Y. 2005) (internal quotation marks omitted).  "Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior." Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999); see also Patsy's Italian Rest., Inc. v. Banas, 575 F. Supp. 2d 427, 461 (E.D.N.Y. 2008) ("[B]ecause trademark law also involves protecting the public's interests, courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious, or clear, unequivocal and convincing") (citations and internal quotation marks omitted).  Examples of such behavior include perjury and fraud on the court.  See, e.g., Goldstein v. Delgratia Mining Corp., 176 F.R.D. 454, 458 (S.D.N.Y. 1997) (enforcing unclean hands defense where plaintiff made multiple misrepresentations to the court regarding law and facts); Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc., 792 F. Supp. 969, 970 (S.D.N.Y. 1992) (enforcing unclean hands defense where defendant company's president fabricated testimony). The burden of proof falls on the party asserting the defense.  See Gidatex, 82 F. Supp. 2d at 130.

OBC argues that summary judgment should be entered dismissing Counts I and II of Excelled's Complaint based on OBC's affirmative defense of unclean hands.  See OBC Mem. at 13; OBC Affirmative Defenses, Am. Answer & Countercl. ¶ 10.  OBC asserts that the trademark registrations that

---

[17] OBC also argues that summary judgment is inappropriate because "Excelled's statement that an incontestable registration cannot be cancelled on the grounds of priority and likelihood of confusion is inaccurate." OBC Opp'n at 16.  Having determined that Excelled is entitled to summary judgment as to the issues of priority and likelihood of confusion, OBC's cancellation claim is accordingly dismissed.

Excelled asserted against OBC in these counts were obtained by fraud on the PTO, because Excelled

obtained expanded rights by "falsely swearing to the PTO that it was using the mark on goods, including

children's clothing, shirts, vests, and pants, that it was no longer selling or had never sold." OBC Mem. at

13.

The standard for proving fraud on the PTO is extraordinarily high. See In re Bose Corp., 580 F.3d

1240, 1243 (Fed. Cir. 2009) ("A party seeking cancellation of a trademark registration for fraudulent

procurement bears a heavy burden of proof."). "Indeed, the very nature of the charge of fraud requires

that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation,

inference or surmise and, obviously, any doubt must be resolved against the charging party." Id. (citation

omitted). This standard applies at the summary judgment stage as well as at trial. See Century Pac., Inc.

v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007).

To prove fraud, it must be shown that the party knew that its representation to the PTO was false,

and that it willfully intended to deceive the PTO. See In re Bose Corp., 580 F.3d at 1245 ("[A] trademark

is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false,

material representation with the intent to deceive the PTO."). "There is no fraud if a false

misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to

deceive." Id. at 1246. In proving the elements of fraud, the proponent of the claim must put forth clear

and convincing evidence. See Mix v. Neff, 473 N.Y.S.2d 31, 33 (N.Y. App. Div. 1984).

OBC claims that Excelled committed fraud on the PTO in its November 15, 2004 application by

falsely representing that it was using the Rogue mark on pants, shirts, and children's clothing. See OBC

Mem. at 16. OBC asserts that Excelled never used the mark on children's clothing before November

2004, and had not used the mark on shirts in 2004. Id. OBC claims that the representations were made

deliberately because the application was signed by William Goldman—Excelled's President—whom

Excelled has identified as the person most knowledgeable about Excelled's sales. Id. at 16-17.

OBC argues that Excelled's misrepresentations were material because the TTAB would not have registered the Rogue mark for shirts, pants, and children's clothing if Excelled had not represented that it was selling those goods as of November 2004. Id. at 16. In support of its claim that Excelled's representations to the PTO were false, OBC argues that Excelled has failed to provide documentary or testimonial evidence that demonstrates its sale of the relevant products. See OBC SUF ¶¶ 63, 64.

In response, Excelled counters that it has sold all of the goods at issue, namely vests, pants, shirts, and children's clothing under its Rogue marks. Excelled Opp'n at 20. Further, Excelled argues that OBC has not met its burden to demonstrate that the alleged conduct was fraudulent. See Excelled Opp'n at 21. In support of its position, Excelled offers the testimony of William Goldman, the President of Excelled. See Decl. of William Goldman in Opp'n to Def.'s Mot. for Summ. J. ("Goldman Opp'n Decl."), ECF No. 81. Goldman explains that there is limited documentary evidence to determine which Rogue mark was used on a particular style of clothing because Excelled has not maintained a master list for style numbers or other relevant documents. Id. ¶¶ 11-14. However, Goldman asserts that based on his personal knowledge, all of the statements made by Excelled to the PTO were true. Id. ¶ 14.

Even viewing the evidence in the light most favorable to OBC, as this Court must on Excelled's motion, OBC has failed to present any clear and convincing evidence that Excelled's representations to the PTO were inaccurate. Because OBC has asserted the affirmative defense, it carries the burden of proof to establish the relevant fraud. See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682, 712 (S.D.N.Y. 2012). OBC has failed to carry its burden, and Excelled has established that there is an absence of evidence from which a reasonable juror could conclude that Excelled's representations to the PTO were false. See Federal Deposit Ins. Corp. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) ("Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its

Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the
[non-moving party's] case.") (internal quotation marks omitted).

Even if OBC could prove that Excelled was not selling some of the specific clothing items listed

in it registrations, OBC has not carried its burden with respect to scienter.  OBC has presented no

evidence of Excelled's deceptive intent.  OBC's reliance on Goldman's corporate position to infer

fraudulent intent is insufficient.  As the court expressly held in In re Bose, proof of fraud requires

evidence that the registrant *knowingly* made a false, material representation with the intent to deceive the

PTO.  See 590 F.3d at 1246.  OBC's fraud claim amounts to an allegation that Goldman must have known

that the information he submitted to the PTO was false.  Such a claim does not demonstrate, by clear and

convincing evidence, that Goldman willfully intended to deceive the PTO.[18]

Furthermore, even if OBC had met its burden of demonstrating that Excelled made false

representations to the PTO, which it has not, the allegations would fall short of being "truly

unconscionable" conduct sufficient to establish an unclean hands defense.  Compare Aptix Corp. v.

Quickturn Design Sys., Inc., 269 F.3d 1369, 1374 (Fed. Cir. 2001) (affirming the district court's dismissal

based on unclean hands where patentee exhibited "extreme litigation misconduct" by submitting

fabricated evidence in discovery to support an earlier invention date, and stating that "rarely, if ever, will

litigation misconduct be so thoroughly documented").  OBC's unclean hands defense is accordingly

dismissed.[19]

---

[18] Compare Melodrama Publ'g, LLC v. Santiago, No. 12 Civ. 7830, 2013 WL 1700929, at *6-7 (S.D.N.Y. 2013) (finding "the
conclusion that [Defendant] procured her trademark registration by fraud [was] inescapable" and ordering cancellation of the
mark where Defendant sought registration of the mark in connection with "a series of books and written articles in the field of
fiction" but had never used the mark in connection with any article, book, or series, and where Defendant had submitted
images of the covers of Plaintiff's books to the PTO as supposed examples of her own use of the mark).

[19] To the extent that OBC attempts to rely on the portions of Kenneth Germain's expert report that contain legal conclusions
with respect to the issue of fraud on the PTO, this Court finds such testimony inadmissible.  See Excelled Opp'n at 23 n.17;
Summary Expert Report of Kenneth B. Germain, Panko Decl. in Supp. of Pl.'s Mot. to Strike, Ex. A ¶ 7 ("I have been asked to
analyze and comment upon…whether certain conduct by Excelled…constituted fraud on the PTO").  Germain's opinion on
whether Excelled committed fraud is inadmissible expert testimony.  See Nimely v. City of New York, 414 F.3d 381, 398 (2d
Cir. 2005) (finding that testimony that undertakes to tell the jury what result to reach and substitutes the expert's judgment for

Excelled has demonstrated that its Rogue marks are valid and it is entitled to priority over OBC in the department and clothing store markets. Further, Excelled has also discharged its burden on summary judgment to show that OBC's use of the mark creates a likelihood of confusion sufficient to find that OBC's use of the mark, in connection with sales in department and clothing stores, constitutes trademark infringement.[20] Because there is no genuine dispute as to the material facts on which this conclusion is based, Excelled is entitled to judgment in its favor as a matter of law. See Fed. R. Civ. P. 56(a). Accordingly, Excelled is granted summary judgment as to its trademark claims in Counts I-III and V of its Complaint, and against Counts I-III of OBC's counterclaims.

### Excelled's N.Y. General Business Law Claim

OBC has moved for summary judgment to dismiss Excelled's claim of counterfeiting and infringement in violation of New York General Business Law § 349(a) (Count IV) on the grounds that Excelled has failed to present any evidence of consumer injury beyond the general likelihood of confusion. OBC Opp. at 13-14. In support of its § 349 claim, Excelled alleges that OBC's sale of "counterfeit imitations" of Excelled's Rogue clothing in Excelled's trade channels was "misleading" to New York consumers. Excelled Mem. at 15.

For commercial claimants under § 349, "the gravamen of the complaint must be consumer injury or harm to the public interest." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995). An injury or harm sufficient under this standard includes "potential danger to the public health or safety." Gucci Am., Inc. v. Duty Free Apparel. Ltd., 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003)).

---

the jury's is inadmissible). Accordingly, this Court disregards Germain's conclusion that OBC committed fraud on the PTO and considers only the underlying evidence presented in Germain's Report and relied upon in OBC's motion.

[20] Although Excelled has established priority, and that OBC's continuing use of the Rogue mark would cause confusion, this conclusion holds true only as to the discrete markets in which the two businesses compete – the department and clothing store markets. Accordingly, although OBC will be enjoined from using the Rogue mark, that injunction will be limited to OBC's clothing that is sold in department and clothing stores, and will not apply to OBC's clothing sold as complements to and in promotion of OBC's brewing and beverage business, sold primarily in OBC's brewpubs and on its website.

Further, "trademark infringement actions alleging only general consumer confusion do not threaten the direct harm to consumers that is required to state a claim under section 349." Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., No. 96 Civ. 5150, 1997 WL 137443, at *3 (S.D.N.Y. Mar. 24, 1997); see also Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd., No. 07 Civ. 6959, 2009 WL 4857605, at *8 (S.D.N.Y. Dec.14, 2009) (holding trademark infringement claims under § 349 require "a specific and substantial injury to the public interest *over and above ordinary trademark infringement*") (emphasis in original); Karam Prasad, LLC v. Cache, Inc., No. 07 Civ. 5785, 2007 WL 2438396. at *2 (S.D.N.Y. Aug. 27, 2007) (finding consumer confusion "insufficient as a matter of law" to establish harm to the public interest).

Excelled has failed to provide evidence of injury or harm to the public beyond consumer confusion. Its § 349 claim is accordingly dismissed.

### OBC's Breach of Contract Claim

In Count V of its Counterclaims, OBC asserts a breach of contract claim against Excelled on the basis of the Cross-License Agreement between OBC and Chinook. See OBC Am. Answer & Countercl. at 28. OBC alleges that Excelled became OBC's trademark licensee under the Cross-License Agreement by way of the TTA between Excelled and Chinook in 2010. Id. OBC further alleges that Excelled's use of the mark Rogue on clothing products and footwear that OBC did not approve and which did not meet OBC's quality standards was in violation of the Cross-License Agreement. Id. at 24, 28.

Excelled argues that OBC cannot prove the elements of a breach of contract. See Excelled Mem. at 22. Specifically, Excelled argues that Chinook was not entitled to transfer its trademark rights under the Cross-License Agreement to Excelled through the TTA. Id. Therefore, absent a valid transfer, Excelled never became a party to the Cross-License Agreement with OBC, and OBC cannot enforce the contract between OBC and Chinook, against Excelled. Id.[21]

---

[21]The Cross-License Agreement expressly states: "This Agreement shall be governed by and Interpreted according to the substantive laws of the State of Oregon." Cross-License Agreement at 3. Furthermore, the choice of law rules in New York—

In response, OBC argues that that there is "a material factual dispute regarding whether Chinook could transfer its rights to Excelled under the Cross-License Agreement." OBC Opp'n at 19. OBC's argument is contrary to the plain terms of the Cross-License Agreement. The express terms of the Cross-License Agreement did not give either party the power to assign or transfer its rights in the Rogue mark: "CHINOOK shall not have the right to grant any sublicense under this Agreement," and "OBC shall not have the right to grant any sublicense under this Agreement." Cross-License Agreement at 1.

Furthermore, trademark rights are not generally assignable absent express language:

> The right of a licensee to sub-license to others must be determined by whether the license clearly grants such a power. A trademark licensee cannot sub-license the mark without express permission from the licensor. Without specific authorization from the trademark owner, the licensee's right to use the licensed mark is personal and cannot be sold or assigned to another.

3 McCarthy § 18.43 (4th ed. 2014); see also Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York) Inc., 925 F. Supp. 212, 218 (S.D.N.Y. 1996); Raufast S.A. v. Kicker's Pizzazz, Ltd., 208 U.S.P.Q. 699, 1980 WL 30295 (E.D.N.Y. 1980)). As the above treatise explains, "because the trademark owner has the duty to control the quality of goods and services sold under the mark, it must have the right to pass upon the abilities of new potential licensees." 3 McCarthy § 18.43. Thus, any purported transfer of Chinook's rights under the Cross-License Agreement to Excelled was invalid.

Absent a valid transfer of the Cross-License Agreement from Chinook to Excelled, OBC cannot establish the first element of its breach of contract claim, i.e. the existence of a contract between itself and Excelled. See Thomas v. One West Bank, FSB, Civ. No. 10-6234-AA, 2011 WL 3585042, at *2 (D. Or. Aug. 15, 2011) ("In Oregon, a plaintiff must allege four elements to state a breach of contract action: 1) existence of a contract, 2) relevant terms, 3) plaintiff's full performance and lack of breach; and 4) harm to plaintiff."); First Nat'l Bank of Eugene v. Hovey, 34 Or. 162, 164 (1899) ("[T]he general [rule]

---

the forum state in this case—direct the Court to apply this choice of law provision. See Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 Fed. App'x. 562, 564 (2d Cir. 2009). Accordingly, this Court applies Oregon law to OBC's breach of contract counterclaim.

require[s] the existence of privity, without which the contract cannot be enforced.").[22]  OBC's breach of contract claim is accordingly dismissed.[23]

## Conclusion

Excelled's motion for summary judgment as to Counts I-III and V of its Complaint, and dismissing all of OBC's counterclaims, is GRANTED.  Excelled's motion for summary judgment with respect to Count IV of its Complaint is DENIED.

OBC's motion for summary judgment dismissing Count IV of Excelled's Complaint is GRANTED.  OBC's motion for summary judgment to dismiss Counts I-III and V of Excelled's Complaint is DENIED.

The Clerk of Court is directed to close the motions at ECF Nos. 56, 61, 66, and 69.

This matter is referred to Magistrate Judge Ronald L. Ellis for an inquest on damages and a determination of injunctive or other equitable relief, including attorneys' fees.

Dated: August 5, 2014
       New York, New York

SO ORDERED

AUG 0 5 2014

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge

---

[22] See also; Washburn v. Interstate Inv. Co., 26 Or. 436, 441 (1894) ("As a general rule, only parties or privies to a contract can maintain an action to enforce its stipulations; and allowing a stranger to do so is an exception to, and inconsistent with, this rule."); Cf. Crabtree v. Tristar Auto. Grp, Inc., 776 F. Supp. 155, 166 (S.D.N.Y. 1991) ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract.").

[23] In addition to failing to demonstrate that Excelled was in privity of contract with OBC, OBC has not sufficiently alleged that Excelled breached any specific term of the Cross-License Agreement. See, e.g., Owen et al. v. Leber et al., 112 Or. 136, 139 (1924) ("There can be no recovery unless plaintiff sets forth a breach by defendant of the contract in suit").  OBC's only allegation is that Excelled is engaged in the use of the mark Rogue on clothing products and footwear that "OBC does not approve" and which do not meet OBC's "quality standards."  OBC Am. Answer & Countercl. at 28; see also Mar. 4, 2014 Oral Argument Tr. 81:20-25, 87:6-8.  However, OBC fails to point to any specific term of the contract that was breached, and does not articulate what conduct was allegedly in breach of such provision.